IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**DONNA POLK**   **PLAINTIFF**

**V.**   **CIVIL ACTION NO. 1:17CV41 LG-LRA**

**NANCY BERRYHILL, ACTING
COMMISSIONER OF SOCIAL SECURITY**   **DEFENDANT**

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Donna Polk appeals the final decision denying her applications for social security disability insurance benefits (DIB) and supplemental security income (SSI). The Commissioner requests an order pursuant to 42 U.S.C. § 405(g), affirming the final decision of the Administrative Law Judge. Having carefully considered the hearing transcript, the medical records in evidence, and all the applicable law, the undersigned recommends this cause be remanded.

In September 2012, Plaintiff filed SSI and DIB applications alleging she became disabled on May 4, 2012, following an automobile accident. She alleges a resulting disability due to "severe chronic headaches; chronic neck pain; back pain; numbness and loss of feeling in right arm, hands, and leg; dizziness with blackouts; [and] shortness of breath." She also allegedly suffers from a limp; reduced leg strength, and slight depression. She has a high school education and was 54 on her application date. She previously received disability benefits for Hodgkin Lymphoma in 1994. Post-recovery, she worked as a medical assistant, a construction worker, and house cleaner. Following

1

agency denials of her current applications, an Administrative Law Judge ("ALJ") rendered an unfavorable decision, finding that she had not established a disability within the meaning of the Social Security Act. The Appeals Council denied Plaintiff's request for review. She now appeals that decision.[1]

At step one of the five-step sequential evaluation,[2] the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. At steps two and three, the ALJ found that although Plaintiff's cervical degenerative disc disease and diabetes mellitus were severe, they did not meet or medically equal any listing. At step four, the ALJ found that Plaintiff had the residual functional capacity to:

> lift/carry and push/pull up to twenty pounds occasionally and up to ten pounds frequently. She can stand/walk six hours in an eight-hour workday. She can sit for six hours in an eight-hour workday. She can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. She must avoid concentrated exposure to unprotected heights and hazardous machinery.[3]

Based on vocational expert testimony, the ALJ concluded that given Plaintiff's age, education, work experience, and residual functional capacity, she could return to her past relevant work as a medical assistant.

---

[1] ECF No. 11, p. 265.

[2] Under C.F.R. § 404.1520, the steps of the sequential evaluation are: (1) Is plaintiff engaged in substantial gainful activity? (2) Does plaintiff have a severe impairment? (3) Does plaintiff's impairment(s) (or combination thereof) meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? (4) Can plaintiff return to prior relevant work? (5) Is there any work in the national economy that plaintiff can perform? *See also McQueen v. Apfel*, 168 F.3d 152,154 (5th Cir. 1999).

[3] ECF No. 11, p. 32.

**Standard of Review**

Judicial review in social security appeals is limited to two basic inquiries: "(1) whether there is substantial evidence in the record to support the [ALJ's] decision; and (2) whether the decision comports with relevant legal standards." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991)). Evidence is substantial if it is "relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d at 295 (5th Cir. 1992)). This Court may not re-weigh the evidence, try the case *de novo*, or substitute its judgment for that of the ALJ, even if it finds evidence that preponderates against the ALJ's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

**DISCUSSION**

Plaintiff assigns three errors on appeal: (1) the ALJ improperly rejected the treating physicians' opinions; (2) the ALJ improperly rejected Plaintiff's subjective complaints; and, (3) the ALJ failed to consider Plaintiff's upper extremity limitations in determining her residual functional capacity. Because the ALJ erred in weighing the treating physicians' opinions, the undersigned recommends that this cause be remanded for further proceedings consistent with this opinion.

Generally, the opinion and diagnosis of a treating physician should be given considerable weight in determining disability. But the treating physician's rule is "not an ironclad rule." *Garcia v. Colvin*, 622 F. App'x 405, 410 (5th Cir. 2015). When treating source opinions are assigned little or no weight, the assignment must be predicated on good cause. *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000). Good causes exists when treating source opinions are "brief and conclusory, not supported by medically acceptable clinical diagnostic techniques, or otherwise unsupported by the evidence." *Garcia,* 622 F. App'x at 410 (internal quotations and citations omitted). However, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician ***only*** if the ALJ performs a detailed analysis of the treating physician's views using [§ 404.1527(d)] factors." *Newton,* 209 F.3d. at 453 (emphasis in original). These factors require that an ALJ consider the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability of the physician's opinion; the consistency of the opinion with the record as a whole; the specialization of the source; and, any other factors tending to support or contradict the physician's opinion.

In this case, the ALJ assigned no weight to the medical opinions of Plaintiff's treating physicians, Dr. Robert Ozon and Dr. Joseph Jackson, both of whom treated Plaintiff in the months following her onset date, and both of whom opined that Plaintiff's

4

spinal disorder met Listing 1.04.[4] Both physicians completed letter questionnaires, prepared by Plaintiff's counsel, affirmatively stating that Plaintiff had: (1) degenerative disc disease resulting in compromise of a nerve root; (2) a disc osteophyte complex producing moderate to severe cervical foraminal stenosis, worst at C5-6 on the right, resulting in compromise in a neuro-anatomic distribution of pain; (3) limitation of the motion in her spine; and, (4) motor loss accompanied by sensory or reflex loss. While Dr. Ozon opined that Plaintiff could not sustain work activity at any level, Dr. Jackson expressed doubt that sedentary work could be performed, but noted that a functional capacity evaluation had not been completed.[5]

Records indicate that Plaintiff was initially diagnosed by Dr. Ozon as having cervical/thoracic strain and headaches secondary to a motor vehicle collision in May 2012. She underwent physical therapy while under Dr. Ozon's care to a degree of success, and he even released her to return to work. However, Plaintiff continued to complain of chronic headaches, cervical and thoracic pain, and radiating pain in her right arm. Dr. Ozon ordered an MRI of the cervical spine which revealed, *inter alia*, evidence of osteophyte complex producing moderate to severe right and moderate left foraminal stenosis, but no disc protrusion or herniation. After reviewing Plaintiff's MRI report, Dr. Ozon discontinued physical therapy and referred Plaintiff to a neurosurgeon for

---

[4] Listing 1.04 requires evidence of nerve root compression that is characterized by neuro-anatomic distribution of pain, limitations of motion of the spine, and motor loss demonstrated by atrophy or muscle weakness with sensation or reflex loss. 20 C.F.R. Pt. 404. Subpt. P, app. 1, § 1.04.

[5] ECF No. 11, 530-536.

evaluation and treatment, which Plaintiff reportedly failed to pursue due to lack of insurance.[6]

Instead of a surgeon, Plaintiff began treatment with Dr. Jackson, a neurologist, in November 2012. Dr. Jackson reviewed the MRI results and made the following observations upon examination:

> While there is clearly pre-existing history of osteoarthritic change there is also clear evidence of C5 VI nerve impingement greater on the right than left side. The patient is extremely clear that she had no pre-existing history of neck pain nor this type of headache prior to the trauma. The patient was referred to a neurosurgeon but unfortunately could not see them. She has no insurance and therefore has not been able to obtain a great deal of additional diagnostic testing. She did undergo approximately 4 months of physical therapy [at] Physicians Care Plaza which significantly improved the low back pain bringing it to at most a 3/10 and at this point an occasional problem. Unfortunately [,] the active radiculopathy in the neck and right arm into a C5-6 distribution has not improved. Therapy did not appear to include any type of cervical traction. The patient has had 4 separate "blackouts" general occurring in the P.M. Generally occurring when the headaches are much worse. These have never been witnessed. She states she is falling to the floor, but has not been incontinent, has no definite postictal state and returns relatively back to normal within a few minutes. As such this would suggest more of a pain-induced vasovagal episode [than] seizure but neither have been pursued or worked up. The patient's headaches have been refractory and [have] gradually if anything worsened. They begin in the neck area but radiate to the right frontal region and are vascular in character associated with all the characteristic post-concussion syndrome including difficulty with recall memory, vertigo primary orthostatic lightheadedness, tinnitus and most recently the syncopal episodes.[7]

Dr. Jackson's records, although duplicative and, at times, difficult to follow, indicate that his treatment of Plaintiff continued through November 2013. Records

---

[6] *Id.* at 377- 434.

[7] ECF No. 11, p. 435.

toward the end of his treatment show that he ordered nerve conduction studies and a wrist splint, but neither are discussed by the ALJ. His last examination of record appears to indicate some improvement in Plaintiff's condition, as well as "significant discogenic changes with nerve root encroachment," continued neck and headache pain, and generalized neuropathy.[8]

The undersigned finds it significant that, in weighing the evidence, the ALJ did not evaluate the treating source opinions at step three, but listed several reasons for discounting them at subsequent steps of the evaluation. The ALJ stated that they were not entitled to any weight because they were "not consistent with the record as a whole or the objective medical evidence on file revealing the claimant's conservative exam findings." These exam findings include Plaintiff's ability to do odd jobs including cleaning houses, babysitting, and driving senior citizens to the doctor or grocery store. The ALJ also found the record consisted of generally conservative findings including "no weakness in her upper limbs, normal motor and sensory, normal reflexes, normal cervical range of motion, and steady and normal gait." The ALJ further noted that because Drs. Ozon and Jackson had not treated Plaintiff since 2012 and 2013 respectively, their opinions were "not based on objective findings but rather on claimant's subjective complaints."[9]

---

[8] ECF No. 11, p. 555.

[9] *Id.* at 34.

On the surface, the ALJ's decision appears to provide good cause for discounting the treating physicians' opinions in compliance with legal standards. However, the undersigned is not persuaded that the ALJ's good-cause assertions are substantiated by the record. A closer review reveals the ALJ's *Newton* analysis was incomplete, and the complete rejection of the treating physicians' opinions is not supported by substantial evidence. *See Newton*, 209 F.3d at 453-58 ("an ALJ is required to consider *each* of the § 404.1527(c) factors before declining to give any [or little] weight to the opinions of the claimant's treating specialist," not just some factors).

It is noted that the ALJ characterizes Plaintiff's housecleaning and babysitting activities as examinations findings. They are not medical findings, nor do they appear to be documented in the medical records of either physician. Actually, it appears that she considered these activities to be inconsistent with the limitations set forth in the treating physician's opinions. While exclusive reliance on daily activities is improper, an ALJ may consider whether they are inconsistent with other record evidence. *Lopez v. Barnhart,* 33 F. App'x 705 (5th Cir. 2002) (citing *Griego v. Sullivan,* 940 F.2d 942, 945 (5th Cir. 1991)). However, no examining or treating physician offered a function-by-function assessment of Plaintiff's limitations, and as Dr. Jackson noted, no functional capacity evaluation had been completed. Further, Plaintiff testified that she does these odd jobs to make ends meet, and cleans houses with the help of other people.

The ALJ's characterization of the medical evidence, particularly those generated by Drs. Ozon and Jackson, as showing "generally conservative findings" is also concerning. The ALJ explained, for instance, that she found their opinions to be

8

inconsistent with the record as whole, and in support, cited instances in the record where Plaintiff exhibited "no weakness in her upper limbs, normal motor and sensory, normal reflexes, normal cervical range of motion, and steady and normal gait." The ALJ acknowledged there were "some deficits on exams," but she did not address with sufficient specificity the more severe clinical findings, or explain how they were inconsistent with the physicians' opinions or the diagnostic testing and objective medical evidence. The record includes findings of acute cervical strain headache, acute myofascial cephalgia, compensatory cervical lordosis, upper extremity weakness, limited full flexion, generalized polyneuropathy, and abnormal sensory findings (most, if not all), documented by Drs. Jackson and Ozon. The ALJ's failure to address this more probative evidence in assessing the supportability of the physicians' opinions makes it difficult to conduct meaningful judicial review. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (explaining that an exhaustive point-by-point discussion is not required, but an ALJ must discuss the evidence offered in support of a disability claim and explain the weight assigned). The undersigned does not mean to suggest there are not conflicts in the medical evidence; the record does include reports of normal examination findings. However, the record does not support the ALJ's assertion that the treating physician opinions were "not based on objective findings but rather on claimant's subjective complaints."[10]

---

[10] ECF No. 11, pp. 33-34, 437.

The ALJ's assertion that the treating physicians' opinions were based on Plaintiff's self-reports is also unsupported and controverted by the record. The exclusive reliance on Plaintiff's self-reports, if true, would be sufficient reason to disregard their medical opinions. *Garcia,* 622 F. App'x at 410; *Greenspan v. Shalala*, 38 F.3d 232 (5th Cir. 1994); *Zimmerman v. Shalala,* 288 F. App'x 931 (5th Cir. 1998). But both physicians, particularly Dr. Jackson, made assessments not generated by Plaintiff's complaints, that were corroborated by an MRI and nerve conduction studies, neither of which were discussed in depth by the ALJ. Such assessments are addressed in detail in Plaintiff's memorandum and reply briefs.

Dr. Jackson, for instance, makes more than one reference in his treatment notes to their being "clear evidence of C5 VI nerve impingement greater on the right than left side." This finding is reiterated in his opinion questionnaire, and cited by Plaintiff as evidence that she met Listing 1.04. The Commissioner argues that although Dr. Jackson notes nerve impingement, "Plaintiff's actual MRI report does not support this conclusion." The Commissioner acknowledges the MRI "shows evidence of stenosis (narrowing) at C4-C5 and C5-C6," but suggests "the record contains no diagnostic evidence" [supporting Dr. Jackson's assertion] that Plaintiff experienced nerve root compression or impingement at any level of the spine." But this Court's review is limited to the reasons presented in the ALJ's decision, and such reasoning is not set forth therein. *Kneeland v. Berryhill*, 850 F.3d 749,761 (5th Cir. 2017). Even if it was, the "determination of whether [Plaintiff's] symptoms indicated nerve root involvement [is] a medical opinion and not the province of the ALJ." *Schnetzler v. Astrue*, 533 F.Supp.2d

272, 290 (E.D.N.Y., 2008). And, "[w]hile another doctor might look at the same record and same radiological examinations and offer opinions differing from [Drs. Jackson and Ozon], that is not the same as finding [their] opinions are not supported by the medical evidence." *Smith v. Colvin*, No. 1:14CV195 SA-DAS, 2016 WL 762693, at *11 (N.D. Miss., Feb. 26, 2016).[11]

An MRI is a medically acceptable diagnostic technique, and Dr. Jackson is a neurologist with an established treating relationship with Plaintiff, who suggested that her spinal impairment met Listing 1.04. Yet, the ALJ did not address his or Dr. Ozon's opinions that Plaintiff met the listing for spinal disorders at step three of the evaluation. The ALJ is not required to discuss every piece of evidence, nor follow formalistic rules of articulation. *Castillo v. Barnhart*, 151 F. App'x 334, 335 (5th Cir. 2005). However, in cases such as this, where treating sources opine that a claimant's impairment meets or equals a listing, it stands to reason that an ALJ should "evaluate the medical opinions while performing the step three evaluation." *Smith v. Astrue*, 507 F. Supp.2d 1170, 1178 (D. Kan. 2007).

Here, the ALJ simply cited listing criteria, advising that "there was no evidence of listing level, nerve root impingement, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication . . . [nor] evidence of ineffective ambulation or evidence

---

[11] ECF No. 21, p. 7. Further, as noted by Plaintiff in her reply brief: "Although the radiologist reading the MRI film did not interpret the Plaintiff's foraminal stenosis as compromising a nerve root or causing nerve root compression, Dr. Jackson, who not only reviewed the MRI film, but also examined the Plaintiff on a number of occasions (whereas the radiologist did not), interpreted the MRI as showing "clear evidence of C5 IV nerve impingement greater on the right than left side." ECF No. 26, p. 8.

11

of objective imaging of nerve root compression." 20 C.F.R. Pt. 404. Subpt. P, app. 1, § 1.04. The failure to address the opinions of Drs. Ozon and Jackson to the contrary, and the probative evidence in support, was error. *See Calzada v. Astrue*, 753 F. Supp.2d 250 (S.D.N.Y. 2010) ("In failing to explain why the MRI evidencing a small disc herniation in close relation to a nerve in plaintiff's lumbar spine was insufficient to support the conclusions of Drs. White and Levy, the ALJ committed a legal error that requires a remand."). The ALJ noted, for instance, that Plaintiff's MRI revealed foraminal stenosis, but she made no mention that it was worse at C5-6. She also observed that Plaintiff responded well to physical therapy, but she failed to discuss Dr. Jackson's observation that "active radiculopathy in the neck and right arm into a C5-6 distribution ha[d] not improved" with physical therapy. And, while she underscored the fact that Plaintiff had not seen Drs. Ozon and Jackson since 2012 and 2013 respectively, she did not address Plaintiff's assertions that she could not afford treatment, nor did she contact Dr. Jackson for a functional capacity evaluation.[12]

The Commissioner undertakes a thorough analysis in defense of the ALJ's decision at step three outlining why Plaintiff's spinal disorder fails to meet listing 1.04, and Plaintiff is reminded of her burden of proof. But again, the "ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton,* 209 F.3d at 455 (citation omitted). It is not the role of the Court to weigh the evidence or assess the supportability of Dr. Jackson's opinions at step three in

---

[12] ECF No. 11, pp. 33, 435.

the first instance. Even if the Court were to find that listing criteria were not met, the lack of analysis of probative evidence casts doubt on both the ALJ's adverse credibility determination and subsequent finding that she could return to her past relevant work. *Morris v. Bowen*, 864 F.2d 335, 335 (5th Cir. 1998). Had the ALJ conducted the requisite analysis of the treating source opinions, there is a "reasonable possibility" that the ALJ would have further limited Plaintiff's residual functional capacity. *January v. Astrue*, 400 F. App'x 929, 933 (5th Cir. 2010) (per curiam).

Here, no consultative physical examination was ordered to assess Plaintiff's functional limitations. The ALJ assigned greater weight instead to the reviewing physicians' opinions and the clinical findings of other examining physicians. However, the reviewing physicians' opinions materially controvert the treating physicians' opinions that Plaintiff met Listing 1.04 and were not based on first-hand examinations. *Barlow v. Berryhill,* 700 F. App'x 375, 376 (5th Cir. 2017) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1023–24 (5th Cir. 1990)). And, as Plaintiff points out, the first-hand examinations credited by the ALJ were performed by an ear, nose and throat specialist and emergency room physicians from whom Plaintiff sought free medical care for asthma, abdominal pain, and nasal problems. While some of these more recent examinations document normal musculoskeletal findings, the ALJ provided no explanation for why these limited examinations should be credited more weight than those performed by her treating neurologists. *Harris v. Astrue*, No. 11-2738, 2012 WL 3150049, at *10 (E.D. La., 2012); *see also Brown v. U.S. Commissioner*, No. 6:15-CV-02171, 2016 WL 7742820 (W.D. La. Dec. 9, 2016) (observing that a contrary medical opinion "was given from the viewpoint

of a doctor who dealt only with the claimant's spinal issues and did not treat her heart condition, her diabetes, her chronic bronchitis, or her other medical problems"). "The opinion of a specialist generally is accorded greater weight than that of a non-specialist." *Newton*, 209 F.3d at 455 (*citing Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)); 20 C.F.R. § 404.1527§ 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Because the ALJ's opinion does not reflect that she considered this factor, it should be considered on remand.

In sum, both Drs. Ozon and Jackson treated Plaintiff after her onset date of disability for complaints relevant to her disability status. While the ALJ has the discretionary power to reject their treating opinions for good cause, particularly when submitted in the format presented here,[13] the good-cause assertions must be substantiated by the record and based on a complete analysis of the relevant factors. Accordingly, this case is remanded for further proceedings consistent with this opinion.

On remand, a comprehensive analysis of the record might not support giving controlling weight to these opinions and may very well result in the same conclusion. Even if a treating source's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed using all of the relevant factors. The Court cannot

---

[13] *See Foster v. Astrue*, 410 F. App'x. 831, 833 (5th Cir. 2011) (observing that the 'questionnaire' format typifies 'brief or conclusory' testimony").

confidently conclude that the ALJ's failure to address the treating source opinions at step three did not affect the analyses at the subsequent steps of the evaluation.  The ALJ should set forth with greater specificity her findings with regard to the listings and the treating source opinions, taking care to link findings to specific evidence.  At a minimum, the ALJ should order a consultative physical evaluation and/or re-contact Dr. Jackson for clarification, or additional evidence under 20 C.F.R. § 404.1520b ("How we consider evidence") (March 26, 2012) (explaining that to resolve inconsistency or insufficiency, the Commissioner may re-contact medical source, request additional evidence, or order a consultative examination).  Because this case is remanded for further development on these grounds, the Court need not consider whether it should be remanded on the other grounds raised herein.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Rule 72(a)(3) of the Local Uniform Civil Rules of the United States District Courts for the Southern District of Mississippi, any party within 14 days after being served with a copy of this Report and Recommendation, may serve and file written objections.  Within 7 days of the service of the objection, the opposing party must either serve and file a response or notify the District Judge that he or she does not intend to respond to the objection.

The parties are hereby notified that failure to file timely written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

15

the district court.  28 U.S.C. § 636, Fed. R. Civ. P. 72(b) (as amended, effective December 1, 2009); *Douglas v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

SO ORDERED on August 16, 2018.

s/ Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE
